## DECLARATION OF NICHOLAS STOCKING

Pursuant to 28 U.S.C. §1746, I hereby declare as follows:

1. My name is Nicholas Stocking.

2. I am above the age of 18.

3. I am a resident and citizen of Orange County, California.

4. I am not laboring with any disability and have personal knowledge of statements made in this declaration.

2. I have been an owner/manager of Mermaid Marine Holdings, LLC since its formation.

3. On June 18, 2022, Mermaid entered into an Agreement with Maverick Yacht Management, LLC ("MYM") to manage the Vessel. See Agreement, attached as Exhibit I.

5. The Agreement stated that MYM would perform the following services:

   i. Yacht will be thoroughly inspected by MYM on a weekly basis. Any discovered faults, deficiencies or issues will be promptly reported to Owner and/or the Yacht's crew.

   ii. Offer recommendations and input regarding contractors and/or repairers needed.

   iii. Offer recommendations and input regarding captain and crewmembers for retention by Owner.

   iv. MYM will provide Owner with a recommended hurricane safety plan by March of each year.

   v. Provide monthly cash flow and budget reports for analysis to assist Owner transform Yacht into a professional business.

   vi. Vessel technical assistance for day-to-day and unique needs of Owner and Yacht, through MYM's global database of contacts.

   vii. 24/7 availability to assist with needs of Yacht through MYM's global database of contacts.

   viii. Logistic and managerial support for any boat shows.

ix. Assist in the marketing and promotion of the Yacht for charter, if desired.

x. If the Yacht is being offered for sale, MYM will assist in the sale by ensuring the Yacht is ready for showings; coordinating with brokers and/ or potential buyers; attending showings and sea trials; and assisting in photography.

6. Prior to signing the Agreement, Johann Faubel ("Faubel") assured me that he was an experienced mariner and that MYM was capable of managing and operating the Vessel. I relied on Faubel's representations and assurances in signing the Agreement. The Agreement did not state that the services to be rendered by MYM would include navigating or operating the Vessel. Although the Agreement stated that MYM would provide Mermaid with a hurricane safety plan, no such plan was ever furnished to me or Mermaid.

7. During the final week of September 2022, Hurricane Ian approached the State of Florida.

8. On September 30, 2022, MYM, Faubel, and/or Juan Meireles ("Meireles")[1] decided to transport the Vessel to North Bay Village. At the time MYM, Faubel, and/or Meireles decided to transport the Vessel back to North Bay Village, the waves and conditions in the Intracoastal were relatively calm and stable; however, the conditions in the Atlantic Ocean near Haulover Inlet and off the coast of Miami-Dade County were severe and significantly more dangerous than the conditions in the Intracoastal.

9. Despite the relatively calm conditions in the Intracoastal, MYM, Faubel, and/or Meireles decided to transport the Vessel via the Atlantic Ocean without first obtaining my authorization or consent.

10. At around 10:53 a.m., the Vessel, while traveling at an excessive rate of speed in the Atlantic Ocean off the coast of Miami-Dade County, Faubel made a sudden and sharp maneuver

---

[1] Meireles is a co-owner of MYM with Faubel and was on board the Vessel at the time of the Incident and during the preceding unauthorized voyage.

portside in response to a wave that had approached the Vessel. Upon information and belief, Faubel and Meireles were the only individuals on the Vessel at that time. Immediately following the sudden maneuver, the Vessel violently slammed several times in short succession resulting in loud banging noises that were heard on a ship-based audio feed and observed through the ship-based video system (the "Incident").

11.     Faubel and Meireles did not assign a person to the position of lookout prior to, or about the time of the Incident, or, if a lookout was assigned, the lookout was not performing his or her duties prior to, or about the time of the Incident, as evidenced by the sudden portside maneuver that caused substantial damage to the Vessel. Additionally, engine alarms were heard from engine display panels and not addressed or discovered by the captain or lookout.

12.     I was not promptly notified by Faubel or Meireles of the Incident. I learned of the Incident about one-hour after it occurred when, to my surprise, I noticed the Vessel was in the Atlantic through an AIS Tracker. I then texted Faubel to find out why the Vessel was taken into the Atlantic and played back the Vessel's video feed at which time I saw a video of the Incident and heard the loud crashing sounds that the Incident generated.

13.     The Vessel's AIS Tracker revealed that following the Incident in the vicinity of Haulover Inlet, Defendants then transported the Vessel further south to the Port of Miami through high waves and rough conditions instead of immediately returning to Fort Lauderdale.[2]

14.     Faubel subsequentially told me via text messages that he had never seen waves that large in South Florida. Faubel took responsibility for the Incident and stated via text message that "we will get her back to 100%", "I apologize for this", "[s]hit happens but we are men of our word, boat will be as good as new", and "Alex and I will be covering the costs for the repairs."

---

[2] *Id.* at ¶ 28.

15. I had the Vessel professionally inspected and substantial damage to the Vessel was revealed. Additional damages were discovered during the repair process, and I am aware that the total repair cost is currently in excess of $900,000.00.

16. Prior to the Incident, the Vessel was in a well-maintained and seaworthy condition with no known defects and the Vessel was used to generate charter income, generating approximately $293,000.00 during 2019-2022.

17. We retook possession of the vessel from Cay Marine on January 24, 2025. We are currently evaluating the vessel to determine if there are any problems or defects with the Vessel to further support a diminished value claim.

### *Interpretation of the Agreement*

9. I understand that MYM has asserted that the Agreement's hold harmless and indemnification provision ("Provision") applies to exculpate MYM from any liability for damaging the Vessel.

10. I also understand that Faubel and Meireles have asserted that they are beneficiaries of the Agreement's Provision and are exculpated from any personal liability for damaging the Vessel.

11. The Provision contained in the Agreement reads as follows:

> *OWNERS ASSUMES ALL RESPONSIBILITY FOR INJURY, DEATH, PROPERTY DAMAGE, OR OTHER CLAIMS OF ANY NATURE THAT MAY ARISE DURING THE TERMS OF THIS AGREEMENT AND/OR THE USE OF THE YACHT. OWNER SHALL INDEMNIFY AND HOLD HARMLESS MYM AGAINST AND FROM ANY LOSS OR EXPENSE MYM MIGHT SUFFER, INCLUDING, BUT NOT LIMITED TO, COURT COSTS AND LEGAL FEES, ARISING FROM OR IN ANY WAY RELATED TO THE USE OF THE YACHT, MYM'S MANAGEMENT OF THE YACHT OR THE SERVICES RENDERED PURSUANT TO THIS AGREEMENT. THIS OBLIGATION SHALL SURVIVE BEYOND THE COMPLETION OR TERMINATION OF THIS AGREEMENT* (emphasis added).

11. MYM drafted the Agreement, including the Provision. I did not make any changes or modifications to the Agreement prior to its execution. I did not discuss the indemnification or hold harmless provision with MYM and at no point in time did MYM state that the Provision or the Agreement was to benefit any other person, including MYM's employees, owners, or agents. I also never had any discussion with MYM that the Provision would apply to exculpate MYM from liability for damages it caused to Mermaid or the Vessel.

12. In entering the Agreement, I had the expectation that it would be enforced in accordance with its plain terms.

15. The Provision states that "owner shall indemnify and hold harmless MYM against and from any loss or expense MYM might suffer, including, but not limited to, court costs and legal fees." This clause/sentence makes clear that the hold harmless and indemnification only applies to MYM's damages. The Provision does not expressly state that it applies to damages to the Vessel or damages incurred by Mermaid.

16. I also note that the Provision does not apply to MYM's use of the Vessel. The Provision states "use of the yacht, MYM's management of the yacht or services rendered pursuant to this Agreement." The absence of the term "MYM" in the section that states "use of yacht" and the inclusion of "MYM" in the section that states "management of the yacht" indicates that the provision does not apply where MYM is using the vessel. My interpretation of the Agreement is that the vessel owner is the party that uses the vessel and that MYM manages the Vessel and performs the services specifically outlined in the Agreement.

16. As for MYM's position that the Provision should extend to cover Faubel and Meireles, they are not parties to the Agreement. Prior to executing the Agreement, MYM never indicated that it believed the Agreement or Provision would apply or cover third-parties. MYM

drafted the Agreement and could have expressly stated in the Agreement that it applied to third-parties including its employees, agents, or owners.

17. Faubel, on behalf of MYM, accepted responsibility for causing the accident and promised to cover the cost of repairing the Vessel. However, Faubel and MYM have reneged on this promise and are now seeking to avoid any liability for the damages that they caused.

18. I declare under the penalty of perjury that the foregoing is true and correct. Executed on this 31st day of May 2025.

_____
NICHOLAS STOCKING